IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NEW HAMPSHIRE INSURANCE COMPANY,

Plaintiff / counter defendant,

3:16-CV-874-PK

v.

OPINION AND ORDER

D.M. FREIGHT SERVICES, INC.,

Defendant / counter claimant.

PAPAK, Magistrate Judge:

Plaintiff/counter defendant New Hampshire Insurance Company ("New Hampshire") filed this action against former defendant Monarch Transportation Services, LLC, and defendant/ counter claimant D.M. Freight Services, Inc. ("DMFS") on May 20, 2016. By and through its complaint, New Hampshire alleges that at all material times it provided commercial inland

marine liability insurance to Monarch Transportation Services, LLC (the "Monarch predecessor entity" or "Monarch LLC"), that at the request of DMFS, New Hampshire's insured Monarch LLC transported two truckloads of yogurt from Johnstown, New York, to Sumner, Washington, that the recipient of the yogurt determined upon each truckload's arrival at its destination that the yogurt had not been maintained at a sufficiently low temperature during transport to ensure its fitness for human consumption, that DMFS subsequently obtained a money judgment against Monarch LLC in the amount of its own liability to the recipient of the yogurt, and that in connection with its efforts to enforce that judgment, DMFS served a writ of garnishment on New Hampshire's registered agent for service of process in Oregon.[1] New Hampshire further alleges that its commercial liability policy does not cover its insured's loss in connection with the rejected shipments of yogurt, and that, in consequence, it is not the proper subject of DMFS' writ of garnishment, in that it is in possession of no property of Monarch LLC. Arising out of the foregoing, New Hampshire seeks this court's declaration that its insurance policy does not cover its insured's losses, as well as award of its fees and costs.

DMFS answered New Hampshire's complaint on June 30, 2016, alleging a counterclaim for garnishment and for payment of judgment. In connection with its counterclaim, DMFS seeks

[1] In fact, notwithstanding New Hampshire's allegations, Monarch LLC was dissolved effective December 31, 2011 (Articles of Dissolution filed January 10, 2012), prior to all events complained of herein. The successor entity to Monarch LLC was Monarch Transportation Services, Inc. (the "Monarch successor entity" or "Monarch"). New Hampshire issued the insurance policy at issue in this action to the Monarch successor entity in June 2013. The Monarch successor entity dissolved in its turn effective December 31, 2015 (Articles of Dissolution filed April 25, 2016), prior to the date this action was filed. Only the successor entity, Monarch, was an active corporate entity during the times material to the parties' dispute, and only Monarch was insured by New Hampshire at any material time.

money damages from New Hampshire in the amount of its judgment against Monarch,[2] specifically $125,314.56, plus award of its fees and costs. Judge Hernández entered default judgment in New Hampshire's favor against Monarch LLC, effective January 3, 2017, based on that entity's failure to make any appearance in this action.[3]

This court has jurisdiction over this action pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and appears additionally to have diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), based on the complete diversity of the parties and the amount in controversy.

Now before the court are DMFS' motion (#41) for summary judgment and New Hampshire's cross-motion (#48) for summary judgment. I have considered the motions, oral argument on behalf of the parties, and all of the pleadings and papers on file. For the reasons set forth below, DMFS' motion (#41) for summary judgment and New Hampshire's cross-motion (#48) for summary judgment are both denied.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

---

[2] DMFS' judgment is in fact against the correct entity, namely Monarch, the successor entity to the Monarch predecessor entity formerly named as a defendant herein.

[3] It is unclear what the legal import of the default judgment against Monarch LLC may be in light of the fact that Monarch LLC was not insured by New Hampshire at any material time.

those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other. *See* Fed. R. Civ. P. 56; *see also, e.g., Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). A court may not grant summary judgment where the court finds unresolved issues of material fact, even where the parties allege the absence of any material disputed facts. *See id.*

///

///

///

## MATERIAL FACTS

### I. The Parties

Plaintiff/counter defendant New Hampshire is a Pennsylvania corporation headquartered in New York. New Hampshire is engaged in the business of providing insurance, including through the issuance of policies for commercial liability insurance.

Defendant/counter claimant DMFS is a Florida corporation headquartered in Florida. DMFS is a freight broker, engaged in the business of arranging freight deliveries by hiring third-party trucking companies for cargo transportation.

Former defendant Monarch LLC, was, during the period of its corporate existence, an Oregon limited liability corporation headquartered in Oregon. The citizenship of its members cannot be determined from the evidence of record. Monarch LLC dissolved effective December 31, 2011 (Articles of Dissolution filed January 10, 2012), and was succeeded by Monarch Transportation Services, Inc. (*i.e.*, Monarch, which was at no time a party to this action). The Monarch successor entity dissolved in turn December 31, 2015 (Articles of Dissolution filed April 25, 2016), before this action was filed. While they were active, both Monarch and former defendant Monarch LLC were engaged in the business of transporting cargo by truck.

### II. The History of the Parties' Dispute

New Hampshire provided Monarch (*i.e.*, the Monarch successor entity rather than former defendant Monarch LLC) a policy of commercial inland marine liability insurance with an effective period from June 18, 2013, through June 18, 2014 (the "policy"). *See* Declaration (#46) of Jonathan C. Smale ("Smale Decl."), Exh. D (policy) at 1. The policy has a coverage limit of $100,000 for loss involving any one vehicle. *See id.*, at 4. The policy provides coverage for

legal liability in connection with loss to property of others under the insured's care, custody, and control that the insured becomes "legally obligated to pay as a common or contract carrier under a bill of lading, contract of carriage, or shipping receipt" issued by or on the insured's behalf. *Id.*, at 6. The policy specifies, however, that it does not cover losses to perishable stock caused by spoilage, except where such spoilage "results in a 'specified peril'," in which case the policy provides coverage for "the loss or damage caused by that 'specified peril'." *Id.* at 11. The policy defines "spoilage" as "any detrimental change in physical state of 'perishable stock,'" including, *inter alia*, "warming of refrigerated goods," and further defines "specified perils" as fire, lightning, windstorm, hail, vehicle collision, vehicle overturn, vehicle derailment, collapse of a bridge or culvert, or theft.[4] *See id.*, at 40.

Notwithstanding the foregoing, the policy expressly provides coverage for loss to other persons' perishable stock caused by "'spoilage' when the refrigeration or heating unit of a 'vehicle' transporting covered property has a sudden or accidental breakdown or malfunction," except that the policy does not provide coverage where such breakdown or malfunction "results from the failure to maintain adequate fuel levels for the refrigeration or heating unit" and does not provide coverage in connection with any such breakdown or malfunction if the insured does not "inspect the refrigeration or heating unit at least once each month." *Id.*, at 19. In addition, the policy expressly excludes such coverage where the insured fails to maintain "a record of each inspection" of such refrigeration or heating units and retains such records for "at least one year." *Id.* The policy further expressly excludes such coverage where the insured fails to provide all

---

[4] The policy provides no explanation as to how spoilage of a perishable good in transit could ever "result[] in" any of the "specified perils". *See id.*, *passim*.

such records to the insurer. *See id.* The policy characterizes the provision for coverage of losses resulting from spoilage of other persons' perishable stock while in course of transit or on a vehicle where the spoilage is caused by a sudden or accidental breakdown or malfunction as a *limitation on coverage*. *See id.* By contrast, the policy characterizes the provisions excluding coverage where such breakdown or malfunction is caused by failure to maintain adequate fuel levels for the refrigeration or heating unit and where the insured fails to inspect the refrigeration or heating unit at least once each month as *exclusions from coverage*. *See id.*

In the event of a loss the insured believes is covered under the policy, the policy requires the insured to give New Hampshire "prompt notice" of the loss "including a description of the property involved." *See id.*, at 11. In addition, if the damaged property is in the care, custody, or control of the insured, the insured is required under the policy to allow New Hampshire to "inspect or take samples of the property." *Id.*, at 12. The policy further requires the insured to provide New Hampshire with all records within its possession and control that relate to the loss. *See id.*, at 19. The requirements that the insured provide New Hampshire with prompt notice of any loss, that the insured permit New Hampshire to inspect damaged property, and that the insured provide New Hampshire with all material records are couched in terms indicating that noncompliance with those requirements would constitute a condition of *forfeiture of coverage* under the policy. *See id.*, at 11, 12, 19.

On or around May 1, 2014, DMFS hired Monarch to pick up 21 pallets of yogurt from a facility in Johnston, New York, for delivery to a location in Sumner, Washington (the "first shipment"). *See* Declaration (#43) of David Mofield ("Mofield Decl."), ¶ 15. DMFS hired Monarch to pick up another 27 pallets of yogurt from the New York facility to the Washington

location on or around May 7, 2014 (the "second shipment"). *See id.*, ¶ 17; *see also id.*, Exh. C. At that time, DMFS had relied upon Monarch for transportation of yogurt between these two locations once or twice weekly without any incident or problem beginning on an unspecified date in 2013. *See id.*, ¶ 13. DMFS agreed to pay Monarch $5,000 for its services in transporting the yogurt. *See id.*, ¶ 15. The bill of lading that memorialized the parties' obligations in connection with the shipments expressly required that the temperature of the yogurt by maintained at 38 degrees Fahrenheit during transportation. *See id.*; *see also id.*, Exhs. A & C; *see also* Declaration (#44) of Lana Semenyuk ("Semenyuk Decl."), ¶ 9; *see also id.*, Exh. A.

Monarch picked up the first shipment of yogurt in New York on May 8, 2014, and delivered it to Washington on May 13, 2014. *See* Mofield Decl., ¶ 15. The recipient of the yogurt rejected the shipment, stamping the bill of lading with the explanation "Refused due to high temp. Temp between 42 to 48 deg." *Id.*; *see also id.*, Exh. B. After the driver returned to Oregon, Monarch arranged to have the refrigeration unit (the "reefer") of the truck that transported the first shipment repaired by third-party Thermo King. *See* Semenyuk Decl., ¶ 11. Thermo King identified and replaced a defective temperature sensor in the reefer. *See id.*; *see also id.*, Exh. C.

Monarch picked up the second shipment of yogurt in New York on May 15, 2014, and delivered it to its Washington destination on May 20, 2014. *See* Mofield Decl., ¶ 18. Monarch relied on a different truck to transport the second shipment than it had relied upon for transportation of the first shipment. *See* Semenyuk Decl., ¶ 12. Again, the recipient rejected the shipment, this time stamping the bill of lading with the explanation "Refused due to high temps of 38 – 45 degrees." Mofield Decl., ¶ 18; *see also id.*, Exh. D; *see also* Semenyuk Decl., ¶ 12;

*see also id.*, Exh. D. After the second shipment was rejected, Monarch sent the truck to Utility Trailer Sales for repair. *See id.*, ¶ 13. Uutility Trailer Sales replaced worn and leaking compressor gaskets and flushed the remaining 18 pounds of freon from the reefer's 20-pound system. *See id.*

It appears that DMFS requested that the rejected yogurt shipments be disposed of at a landfill, but that Monarch nevertheless donated the shipments to a California-based charity called "Children of the Streets," which subsequently distributed the yogurt "to various people and places." Declaration (#49) of Ahmed Zarnegar ("Zarnegar Decl."), ¶ 9; *see also* Semenyuk Decl., ¶ 15. Children of the Streets is an addiction recovery program with a rural facility where program participants assist in running a farm and rasing livestock. *See id.* Monarch's former principal testified to her understanding that the yogurt was used by Children of the Streets for livestock feed. *See id.* Monarch received receipts from Children of the Streets indicating that the yogurt was received for purpose of provision to livestock. *See* Smale Decl., Exh. F ("AMS Report I"), at 3; *see also id.*, Exh. H ("AMS Report II"), at 3. DMFS offers the testimony of its food science expert witness, Lisbeth Goddik, Ph.D., that based on the available data, she did not believe that any person could have found a market for the shipped yogurt or could have declared it safe for human consumption. *See* Declaration (#45) of Lisbeth Goddik, Ph.D., ("Goddik Decl."), ¶ 19. Goddik specifically testified, in addition, that USDA guidelines require that yogurt be stored at a temperature of 45 degrees Fahrenheit or cooler. *See id*, ¶ 15.

The yogurt seller made a demand on DMFS to pay for the two rejected shipments. *See* Mofield Decl., ¶ 19. DMFS conceded liability, either as a common carrier or as a contracting party, and paid the seller a total of $125,314.56 for the cost of the spoiled yogurt ($54,825.12 for

the first shipment and $70,489.44 for the second shipment). *See id.*; *see also id.*, Exhs. E & F.

DMFS subsequently made a demand on Monarch for reimbursement of the amounts it paid for the two rejected shipments. *See id.*, ¶ 20. On or around June 24, 2014, Monarch notified its insurer (*i.e.*, New Hampshire) of DMFS' demand and of the underlying loss. *See* Smale Decl., Exh. 8 ("AIG Denial Letter"), at 2. On December 31, 2014, New Hampshire issued a reservation of rights in connection with Monarch's claim on the policy. *See id.*, at 1.

It appears that at some time over the next few months, New Hampshire retained two claim support companies, Alpha Marine Surveyors ("AMS") and AE Claims Management & Consulting, LLC ("AECMC"), to assist it in determining whether Monarch was entitled to coverage in connection with DMFS' demand for reimbursement. On November 21, 2014, the principal of AECMC, Ahmed Zarnegar, sent an email message to New Hampshire claims adjustors and other recipients in which he noted that he had been informed by representatives of Monarch that the reefers used in connection with both rejected shipments of yogurt had respectively been purchased in March 2014 and May 2014. *See* Smale Decl., Exh. I.

On April 17, 2015, AMS provided New Hampshire with two reports, one regarding the first shipment, *see* AMS Report I, and one regarding the second shipment, *see* AMS Report II. The first report expressed AMS' opinion that, *inter alia*, (i) the available records did not identify with precision which Monarch truck was used to ship the first shipment of yogurt, (ii) Monarch had provided records of three inspections of the refrigeration unit of the truck it claimed had transported the yogurt (specifically from March, April, and May 2014), including one from ten days prior to the rejection of the first shipment which indicated that the freon test had been passed, (iii) the inspection records provided by Monarch were not adequately detailed, (iv)

available records did not indicate on what basis it was determined that the yogurt was spoiled, (v) the refrigeration unit of the identified truck was repaired on May 15, 2014, at which time it was noted that the temperature sensor was "jumping around at times," (vi) the data downloaded from the truck's refrigeration unit did not correspond to the dates of the first shipment, and (vii) AMS' examination of the available data indicated that the refrigeration set point was reset several times during the course of the first shipment. *See* AMS Report I, at 1-5. AMS opined to similar effect in connection with the second shipment, specifically that, *inter alia*, (i) the available records did not identify with precision which Monarch truck was used to ship the second shipment of yogurt, (ii) available records did not indicate on what basis it was determined that the yogurt was spoiled, (iii) the data downloaded from the truck's refrigeration unit did not correspond to the dates of the second shipment, (iv) the records from the repair of the refrigeration unit after the second shipment was reflected indicate that only cursory servicing was performed, and (v) AMS' examination of the available data indicated that the refrigeration set point was reset several times during the course of the second shipment. *See* AMS Report II, at 1-5. The second report was silent as to whether Monarch had provided records of inspections of the second truck's refrigeration unit. *See id., passim*.

Also on April 17, 2015, New Hampshire denied coverage in connection with Monarch's claim on the ground that Monarch had failed to establish that the spoilage of the yogurt was caused by a sudden or accidental breakdown or malfunction of the Monarch trucks' reefers, and on the additional grounds that Monarch had failed to provide it with a full year of inspection records for the trucks' refrigeration units, had not notified New Hampshire promptly of the loss, had failed to make the yogurt available for its inspection, had not provided New Hampshire with

all relevant records, had not cooperated with New Hampshire's investigation of the loss, and had not demonstrated that the loss occurred while the yogurt was in Monarch's care, custody, and control. *See* AIG Denial Letter, at 1; *see also id., passim.* Monarch likewise refused to reimburse DMFS for its payments to the yogurt seller. *See* Mofield Decl., ¶ 20.

On May 18, 2015, DMFS sued Monarch and its parent company in the United States District Court for the Northern District of Georgia. *See* Smale Decl., Exh. A ("NDGA Docket").

On May 21, 2015, New Hampshire received a report from AECMC regarding both rejected shipments. *See* Smale Decl., Exh. G ("AECMC Report"). The AECMC Report was to much the same effect as the AMS reports. *See id., passim.* AECMC's principal Zarnegar testifies that he asked Monarch to explain why the refrigeration unit download dates did not correspond to the dates of the two shipments, and why the documentation provided did not unambiguously identify with precision which truck was relied upon in connection with each shipment, but that Monarch provided no response. *See* Zarnegar Decl., ¶ 8; *see also id.*, ¶¶ 5-7.

The United States District Court for the Northern District of Georgia awarded default judgment against Monarch in DMFS' favor in the amount of $125,314.56 on August 21, 2015. *See* NDGA Docket. DMFS registered its judgment in the Clackamas County Circuit Court on November 24, 2015. *See* Smale Decl., Exh. B ("Clackamas County Register of Actions"). On December 15, 2015, DMFS issued a writ of garnishment on New Hampshire in connection with its judgment against Monarch. *See* Smale Decl., Exh. C ("Writ of Garnishment").

This action followed.

## ANALYSIS

Before the court are the parties' cross-motions for summary judgment as to whether New

Hampshire owed Monarch a duty to provide it with insurance coverage in connection with its liability to DMFS. As noted above, the policy expressly provides coverage for loss to other persons' perishable stock while under the insured's care, custody, or control in due course of transit or on a vehicle, where such loss is caused by "'spoilage' when the refrigeration or heating unit of a 'vehicle' transporting covered property has a sudden or accidental breakdown or malfunction," except that the policy does not provide coverage where such breakdown or malfunction "results from the failure to maintain adequate fuel levels for the refrigeration or heating unit" and does not provide coverage in connection with any such breakdown or malfunction if the insured does not "inspect the refrigeration or heating unit at least once each month." Policy at 19. In addition, the policy expressly conditions provision of such coverage on the insured's maintenance of "a record of each inspection" of such refrigeration or heating units, and retention of such records for "at least one year." *Id.* The policy further expressly conditions provision of such coverage on the insured's provision of all such records to the insurer where the insured seeks reimbursement under the policy for a loss caused by the sudden or accidental breakdown or malfunction of a refrigeration or heating unit. *See id.* In the event of a loss the insured believes is covered under the policy, the policy requires the insured to give New Hampshire "prompt notice" of the loss "including a description of the property involved." *See id.*, at 11. In addition, if the damaged property is in the care, custody, or control of the insured, the insured is required under the policy to allow New Hampshire to "inspect or take samples of the property." *Id.*, at 12. The policy further requires the insured to provide New Hampshire with all records within its possession and control that relate to the loss. *See id.* As a preliminary matter, it is necessary prior to consideration of the merits of the parties' respective arguments to

determine which party bears the burden of proof as to which elements of the coverage determination.

It is well settled under Oregon law that it is the burden of the insured in an insurance dispute to prove coverage, and the burden of the insurer to prove an exclusion from coverage. *See FountainCourt Homeowners' Ass'n v. FountainCourt Dev., LLC*, 360 Or. 341, 360 (2016), *quoting ZRZ Realty Co. v. Beneficial Fire & Cas. Ins. Co.*, 349 Or. 117, 127 (2010). For purposes of this determination, the Oregon courts distinguish between questions relating to *limitations on coverage*, which they treat as "coverage" questions, and questions relating to *exclusions from coverage*, which they treat as "exclusion" questions. *See ZRZ*, 349 Or. at 127, 127-133. Moreover, the Oregon courts recognize that there may be no difference in the rights and obligations of the parties to an insurance policy providing broad coverage subject to exclusions versus those of the parties to an insurance policy providing limited coverage subject to no exclusions, and treat the choice of the drafter of an insurance policy to characterize a restriction on coverage as a limitation or as an exclusion as controlling for purposes of the burden-allocation issue. *See id.* at 133.

Oregon law also distinguishes between conditions of forfeiture of coverage and conditions precedent to coverage:

> "A condition of forfeiture exists when there is insurance coverage for the loss in the first place, but acts of the insured nullify the coverage. A condition of forfeiture disallows claims that otherwise are covered under a policy." *Herman v. Valley Ins. Co.*, 145 Ore. App. 124, 130-31, 928 P.2d 985 (1996), *rev. den.*, 325 Ore. 438, 939 P.2d 621 (1997). Examples of conduct by the insured that triggers a condition of forfeiture include the filing of a false statement, *ABCD Vision[, Inc. v. Fireman's Fund Ins. Cos.]*, 304 Ore. [301,] 306 [(1987)]; failure to protect the insured property, *id.*; vacating a building after issuance of a fire insurance policy, *Kabban v. Mackin*, 104 Ore. App. 422, 429, 801 P.2d 883 (1990); and failing to

> obtain the insurer's consent before settling a claim, *Federated Service Ins. Co. v. Granados*, 133 Ore. App. 5, 8, 889 P.2d 1312, rev. den., 321 Ore. 512, 900 P.2d 509 (1995). The unifying fact connecting each of those examples is an act of the insured that nullifies otherwise pre-existing coverage.

*Richardson v. Guardian Life Ins. Co. of Am.*, 161 Or. App. 615, 625 (1999) (original modifications omitted). Under Oregon law, an insurer is not relieved of the obligation to indemnify its insured due to a breach of a condition of forfeiture unless it can establish that it was prejudiced by the insured's failure and the insured's failure was unreasonable under the circumstances. *See, e.g., Lusch v. Aetna Cas. & Sur. Co.*, 272 Or. 593, 597, 598-600 (1975); *see also McBride v. State Farm Mut. Auto. Ins. Co.*, 282 Or. App. 675, 688 (2016), *citing Wright v. State Farm Mutual Automobile Ins. Co.*, 223 Or. App. 357, 370-371 (2008).

> In contrast to a condition of forfeiture, "**a condition precedent is one that must occur before liability arises on the promise that the condition qualifies.**", *Phoenix-Talent School Dist. #4 v. Hamilton*, 229 Ore. App. 67, 73, 210 P3d 908, *adh'd to on recons*, 230 Ore. App. 330, 215 P3d 111, *rev den*, 347 Ore. 348, 222 P.3d 29 (2009); *see also Dan Bunn, Inc. v. Brown*, 285 Ore. 131, 142-43, 590 P2d 209 (1979) (stating that **conditions precedent are facts that arise subsequent to the formation of the contract that must exist or occur before there is a right to expect performance from the other side**). A condition precedent is a contractual condition that is based on "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." *Wright*, 223 Ore. App. at 370 n 14 (internal quotation marks omitted).

*McBride*, 282 Or. App. at 688-689 (original modifications omitted; emphasis supplied). An insurer need not establish prejudice or unreasonableness in order to deny coverage on the basis of failure to comply with a condition precedent. *See id.* at 688.

Here, as noted above, the policy characterizes the provision for coverage of losses resulting from spoilage of other persons' perishable stock while under the insured's care, custody, or control in due course of transit or on a vehicle as a *provision for coverage*, characterizes the

provision limiting coverage for such losses to circumstances where the spoilage is caused by a sudden or accidental breakdown or malfunction as a *limitation on coverage*, characterizes the provisions excluding coverage where such breakdown or malfunction is caused by failure to maintain adequate fuel levels for the refrigeration or heating unit and where the insured fails to inspect the refrigeration or heating unit at least once each month as *exclusions from coverage*, and characterizes the provisions requiring the insured to provide prompt notice of loss, to permit inspection of damaged property, and to provide all records relating to a loss as *conditions of forfeiture*. *See* Policy, at 11, 12, 19. It follows that DMFS bears the burden as to whether the spoilage occurred in the course of transit or on a vehicle while under Monarch's control and as to whether the spoilage was caused by a sudden or accidental breakdown or malfunction of a vehicle's refrigeration unit, whereas New Hampshire bears the burden as to whether the malfunction of the refrigeration unit was caused by failure to maintain adequate fuel levels, as to whether Monarch failed to inspect the refrigeration unit at least once each month, and as to whether it suffered prejudice in connection with Monarch's notice of loss, disposal of the rejected yogurt before it could be inspected, and/or provision of records relating to the loss.

As to the matters in connection with which DMFS bears the burden of proof, I agree with DMFS that it has satisfied its burdens whether the evidence of record is considered in the light most favorable to New Hampshire (for purposes of DMFS' motion for summary judgment) or in the light most favorable to DMFS (for purposes of New Hampshire's cross-motion for summary judgment). First, it is undisputed that Monarch became liable to DMFS for a money judgment arising out of the warming of a perishable refrigerated product (spoilage) that occurred while the product was in transit on a vehicle under Monarch's control pursuant to a bill of lading.

Second, I find that DMFS has met its burden to establish that the spoilage of the yogurt occurred as a result of accidental malfunctions of the reefers of the Monarch trucks in which the yogurt was being transported. New Hampshire takes the position that DMFS failed both to establish that the breakdown or malfunction that caused the spoilage was sudden or accidental and to establish that the breakdown or malfunction occurred while the yogurt was in transit as opposed to any time before the yogurt was loaded onto Monarch's truck in New York. However, there can be no serious argument on the basis of the evidentiary record that the breakdown or malfunction could have been other than accidental: the record contains no suggestion that DMFS intended or expected the malfunctions to occur, and contrary to New Hampshire's suggestion, if the malfunctions occurred as a result of deterioration of Monarch's equipment or of Monarch's failure adequately to maintain it, such malfunctions would nevertheless be accidental so long as they were neither intended nor expected. Similarly, it is immaterial whether the malfunction of the reefers occurred prior to or during transit: if the spoilage occurred during transit (and there is no suggestion in the record that the yogurt could have been rejected on the basis of the temperature at which it was stored prior to being loaded onto Monarch's trucks) as a result of the imperfect or inadequate functioning of Monarch's reefers, the loss was caused by a malfunction of the refrigeration unit.[5] Thus, whether the evidence is considered in the light most favorable to

---

[5] New Hampshire argues to the contrary that loss is only covered for spoilage occurring "when the refrigeration or heating unit of a 'vehicle' transporting covered property has a sudden or accidental breakdown or malfunction," and that the use of the present tense verb "has" in that provision requires that the malfunction occur during transit, and not prior to transit. I disagree. At most, the provision is ambiguous as to whether the use of the present tense verb "has" could require the court to New Hampshire's interpretation. In the event I found that the provision contained such an ambiguity, I would be required to resolve the ambiguity in favor of Monarch, the insured. *See, e.g., Allen v. Cont'l Cas. Co.*, 280 Or. 631, 633 (1977). Absent any such ambiguity, I would find as set forth above that it is immaterial for purposes of the coverage

New Hampshire or to DMFS, DMFS has met its burden to establish that each spoilage event was caused by an accidental malfunction of a Monarch refrigeration unit.

As to the matters in connection with which New Hampshire bears the burden of proof, I note that New Hampshire does not offer evidence tending to establish that the malfunctions of the refrigeration units were caused by failure to maintain adequate fuel levels. That exclusion from coverage is therefore not at issue in connection with the parties' dispute. In addition, I do not find that New Hampshire has met its burden of proof as to whether it was prejudiced as a result of the timing of Monarch's notice of loss, of the fact that the yogurt was disposed of before New Hampshire could be inspected, or of Monarch's provision of records relating to the loss. Specifically as to the timing of Monarch's notice of loss, New Hampshire does not attempt to show that it was prejudiced by any failure to provide earlier notice except to the extent that it was deprived of the opportunity to inspect either of the two rejected shipments of yogurt. As to Monarch's failure to make either of the shipments available for New Hampshire's inspection, New Hampshire makes no showing that inspection of the yogurt could have yielded otherwise unavailable information material to any element of the coverage inquiry, and the only evidence of record as to whether the rejected yogurt retained market value following its rejection is the opinion testimony of DMFS' food science expert Goddik, who opined that after yogurt is rejected for having been stored at too high a temperature, it is no longer marketable. And as to Monarch's provision to New Hampshire of records relating to the loss, although there appear to have been errors in some of the records provided – including in particular data downloads from the

---

provision whether the malfunction occurred or began to occur prior to or during transit, so long as the spoilage itself occurred in transit.

malfunctioning reefers with significantly inaccurate timestamps – and although there is some question (discussed below) as to whether Monarch provided all material records within its possession or control, New Hampshire has not met its burden for purposes of either of the pending cross-motions to establish that it was affirmatively prejudiced by any failure to produce records, in that it is undisputed that New Hampshire's claims consultants were able to analyze the coverage question on the basis of the records made available to them.

However, the evidentiary record leaves unresolved an open question of fact as to the question of Monarch's compliance with the requirement that it inspect its trucks' refrigeration units at least once per month in order to avoid an exclusion from coverage. It is DMFS' position, based solely on the Zarnegar email message of November 21, 2014, that the reefers used in connection with the rejected shipments of yogurt had respectively been purchased in March 2014 and May 2014. *See* Smale Decl., Exh. I. On that basis, DMFS argues that Monarch's production of inspection records from March, April, and May 2014 reflected compliance with the monthly inspection requirement for the refrigeration unit used in transporting the first shipment, and that Monarch could not have been out of compliance with the inspection requirement for the refrigeration unit used in transporting the second shipment because a full month had not yet lapsed between Monarch's acquisition of that refrigeration unit and the rejection of the second shipment. New Hampshire takes the contrary position that Monarch was out of compliance with the requirement that it inspect its refrigeration units monthly and retain records of all such inspections for a period of at least one year, and on that basis argues that Monarch's losses were necessarily excluded from coverage under the policy.

The Zarnegar email message of November 21, 2014, constitutes hearsay with regard to

the proposition that Monarch acquired the trucks at issue in March and May 2014. The courts of the Ninth Circuit permit a non-movant to establish a genuine issue of material fact precluding a grant of summary judgment in a moving party's favor on the basis of hearsay evidence, but require that a moving party rely only on evidence admissible in both form and content in seeking to obtain summary judgment in its own favor. *See e.g.*, *Fraser v. Goodale*, 342 F.3d 1032, 1036-1037 (9th Cir. 2003); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028-1029 (9th Cir. 2001); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988); *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987). For purposes of DMFS' motion for summary judgment, therefore, this court cannot consider the Zarnegar email as tending to support the proposition that Monarch acquired the trucks in March and May 2014. It follows that, for purposes of DMFS' motion, there is necessarily a question of fact precluding grant of summary judgment in DMFS' favor regarding the applicability of the exclusion from coverage for losses caused by the malfunction of a refrigeration unit that was not subjected to monthly inspections. DMFS' motion (#41) for summary judgment is therefore denied.

For purposes of New Hampshire's motion for summary judgment, however, this court may properly consider the Zarnegar email message as evidence tending to support the proposition that Monarch acquired the trucks at issue in March and May 2014. In connection with New Hampshire's motion, this court is required to construe that evidence in the light most favorable to DMFS. In light of the Zarnegar email message, a question arises whether Monarch's recent purchase of the two refrigeration units is sufficient to effect a *de facto* waiver of the policy requirement that Monarch inspect its refrigeration units monthly, and retain the records of all such inspections for a period of at least one year, in order to avoid application of the exclusion

from coverage.

As to that question, I find that it is a reasonable interpretation of the policy's coverage exclusion for failure to inspect refrigeration units at least once per month that Monarch was under an obligation to maintain records establishing that even a recently acquired refrigeration unit was inspected at least once prior to being used to ship perishable stock, whether by the unit's previous owner or by Monarch after the unit was acquired. However, it is likewise a reasonable interpretation of the coverage exclusion language that the exclusion is applicable in connection with spoilage caused by a sudden or accidental breakdown or malfunction of a recently purchased refrigeration unit only where the insured failed to inspect the unit within one month following the purchase. As noted above, this court is required to resolve any ambiguity between those two reasonable interpretations of the provision in favor of Monarch, the insured. *See*, *Allen*, 280 Or. at 633. It follows that, interpreting the content of the Zarnegar email message in the light most favorable to DMFS, there is a question of fact as to whether Monarch was in full compliance with its inspection obligations, and that question of fact is sufficient to preclude grant of

///

///

///

///

///

///

///

///

summary judgment in New Hampshire's favor. New Hampshire's cross-motion (#48) for summary judgment, like DMFS', is therefore denied.

## CONCLUSION

For the reasons set forth above, DMFS' motion (#41) for summary judgment and New Hampshire's cross-motion (#48) for summary judgment are each denied.

Dated this 28th day of February, 2018.

Honorable Paul Papak
United States Magistrate Judge